In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-3205

IRENE M. GESCHKE, individually
and as Executor of the Estate of
Clarence O. Geschke,

*Plaintiff-Appellant*,

*v.*

AIR FORCE ASSOCIATION and
MONUMENTAL LIFE INSURANCE COMPANY,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 02 C 50271—**Philip G. Reinhard**, *Judge*.

ARGUED APRIL 7, 2005—DECIDED SEPTEMBER 23, 2005

Before MANION, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Clarence Geschke purchased a defined-benefit supplemental cancer insurance policy that promised to reimburse him for "incurred expenses for the cost of blood or blood plasma." Geschke developed leukemia and required numerous blood transfusions. He later died, and his widow, Irene Geschke, filed an insurance claim that included $33,689.81 in expenses for blood and transfusion-related charges such as laboratory testing, equipment, drugs, administrative fees, and other transfusion expenses.

The insurer paid only the cost of the blood product itself, or $1,245.10, and denied coverage for the related charges. Mrs. Geschke filed suit in state court against the insurer and the association that marketed the policy to her late husband, alleging breach of contract, common law fraud, and violation of the Illinois Consumer Fraud Act ("ICFA"). The defendants removed the case to federal district court.

The district court granted summary judgment to the defendants, holding that the unambiguous policy language covered only the cost of the blood itself and not other costs associated with its delivery and administration. We agree with this conclusion. The insurance policy expressly covers only "incurred expenses for the cost of blood or plasma," not related transfusion charges. This coverage language is clear and unambiguous. Accordingly, the insurer did not breach its contract by paying only that portion of the transfusion-related claim that consisted of the cost of the blood. Summary judgment in favor of the defendants on the common law and statutory fraud claims was also appropriate, as there is no evidence of any false statement or deceptive act by the defendants in connection with the sale of the policy.

## I.  Background

In May 1997 Clarence Geschke enrolled in the Air Force Association's ("AFA") CancerCare Plan, a supplemental cancer insurance policy underwritten by Monumental Life Insurance Company ("Monumental" or "the insurer"). The policy and its associated riders provided defined benefits for certain expenses incurred in the treatment of cancer, such as hospitalization, hospice care, ambulance services, anesthesia, and blood and plasma. As is relevant here, the "Blood and Plasma Benefit Rider" included in Mr. Geschke's policy provided as follows:

Upon receipt of due proof that the Covered Person

> incurred expenses for the cost of blood or blood plasma, we will pay a benefit for these expenses not to exceed the Maximum Benefit shown on the Schedule. The expense of blood or blood plasma incurred while Hospital Confined, as an outpatient or in a free standing facility is eligible for this benefit.

The rider's maximum benefit per Illness Period was $500, but the Schedule of Benefits also indicated that there was no maximum for leukemia. Mr. Geschke paid a quarterly premium of $31.50 for "Member & Family" coverage under the policy and its associated riders.

Mr. Geschke was diagnosed with leukemia in March 1999. On or about April 14, 1999, he sent Monumental a claim form seeking benefits for inpatient and outpatient services provided by Sherman Hospital in 1998 and early 1999. The parties dispute exactly when Mr. or Mrs. Geschke provided Monumental with documentation sufficient to establish Mr. Geschke's cancer diagnosis, as required by the policy, but the issue is no longer material. Sadly, Mr. Geschke died on June 21, 1999.

On October 18, 1999, Mrs. Geschke submitted an updated claim to Monumental for $37,622.37. Of that amount, $33,689.81 related to Mr. Geschke's blood transfusions. In December 1999 Monumental paid $2,114.61 to Mrs. Geschke for hospitalization, surgical, and anesthesia charges. Later, on March 31, 2000, Monumental paid $1,245.10 under the Blood and Plasma Benefit Rider. In a follow-up letter to Mrs. Geschke dated June 23, 2000, Monumental explained that the Blood and Plasma Benefit Rider did not cover processing or administrative fees, supplies, drugs, or laboratory charges associated with the blood transfusions, and that Monumental was declining to cover the remaining $32,444.71 of the transfusion-related claim.

Mrs. Geschke never cashed Monumental's checks.

Instead, she filed suit against Monumental and the AFA in Illinois state court, alleging breach of contract and seeking recovery of benefits under the Blood and Plasma Benefit Rider. She also alleged common law fraud and fraud under the ICFA, 815 ILCS §§ 505/2 *et seq*. The gravamen of both fraud claims is that by failing to explain that the Blood and Plasma Benefit Rider covered only the cost of blood products and not related tranfusion expenses, the defendants fraudulently induced Mr. Geschke to purchase the policy and pay premiums. For each of the three claims, compensatory damages were alleged to be "in excess of $20,000 and not more than $50,000." In addition, the two fraud claims included demands for punitive damages. Monumental, a corporation chartered and located in Maryland, removed the case to federal court with the consent of the AFA, a corporation chartered under the laws of the District of Columbia and located in Virginia. Thereafter the defendants moved for summary judgment, which the district court granted.[1]

The district court concluded that although the terms "blood" and "plasma" are not defined in the policy, a reasonable person would understand that the phrase "cost of blood or blood plasma" refers to the cost of the blood product itself and not to other costs associated with the administration of the blood product to a sick person. As

---

[1] The motion for summary judgment was considered upon Geschke's second amended complaint, which was styled as a class action on behalf of all persons who purchased the CancerCare policy within ten years of the commencement of this action and who were denied benefits under the Blood and Plasma Benefit Rider for the same reasons the Geschkes' claim was denied. Nothing in the record indicates that a motion for class certification was filed or ruled upon, and the district court's decision on summary judgment does not treat the case as a class action.

such, the court held that Monumental did not breach its contract with Geschke. The court also held that Mrs. Geschke could not carry her burden on the common law and statutory fraud claims because no misrepresentation could be inferred from policy language that was unambiguous, and no other evidence of false statements or deception by the defendants had been presented.

## II. Discussion

### A. Jurisdiction

The parties did not raise the issue of the district court's jurisdiction, but the defendants argued, both in the lower court and on appeal, that Mrs. Geschke's two fraud claims did not accrue prior to Mr. Geschke's death and therefore abated. We asked at oral argument whether only the breach of contract claim should be considered for purposes of the $75,000 amount-in-controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332(a). We asked whether the damages potentially recoverable in the breach of contract action were above $75,000. After considering the parties' supplemental briefing on this issue, we are satisfied that the district court had jurisdiction over Mrs. Geschke's suit.

Whether § 1332 supplies jurisdiction must be determined at the outset of a case; "events after the suit begins do not affect . . . diversity jurisdiction." *Johnson v. Wattenbarger*, 361 F.3d 991, 993 (7th Cir. 2004) (citing *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426 (1991), and other cases). We therefore look to Mrs. Geschke's first complaint, the one the defendants removed to federal court, to see whether the case satisfies the jurisdictional threshold of $75,000. Each of Mrs. Geschke's three claims sought compensatory damages in the amount of $20,000 to $50,000, plus prejudgment interest. The two fraud claims each also demanded an

award of punitive damages. "It is the *case*, rather than the *claim*, to which the $75,000 minimum applies." *Johnson*, 361 F.3d at 993. The total amount at stake was thus clearly above that mark.

Whether or not the defendants could succeed with their argument that the fraud claims abated upon Mr. Geschke's death is immaterial to the jurisdictional question. Only if it were *legally impossible* for Geschke to win on claims totaling more than $75,000 would her suit fail for want of jurisdiction. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938); *Johnson,* 361 F.3d at 993-94. "Legal impossibility" in this sense differs from the standard for dismissal for failure to state a claim under FED. R. CIV. P. 12(b)(6); that there may be a plausible argument that the plaintiff's claims must fail as a matter of law does not mean the court lacks jurisdiction to consider them. *Bell v. Hood*, 327 U.S. 678 (1946); *Johnson,* 361 F.3d at 993-94. If it were otherwise, "defendants would never *win* in diversity cases. They could at best achieve jurisdictional dismissals, followed by new suits in state court." *Johnson*, 361 F.3d at 994.

The defendants' argument that the fraud claims failed to accrue before Mr. Geschke's death or that if they did accrue, did not survive his death, hardly colors this suit as a "legal impossibility." Though we need not decide the issue, the defendants are probably wrong about the accrual question. *See Knox College v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1981) (under Illinois' discovery rule, fraud claim accrues "when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused"). The question of the survival of the punitive damages aspect of the common law and statutory fraud claims is apparently unsettled in Illinois. *See* 755 ILCS 5/27-6 (Illinois Survival Act) (West 1994) ("In addition to the actions which survive by the common law, the following also survive: . . .

actions for fraud or deceit."); *Nat'l Bank of Bloomington v. Norfolk & W. Ry. Co.*, 383 N.E.2d 919, 924 (1978) (punitive damages can be recovered if the underlying action is predicated on a statute that specifically authorizes the recovery of punitive damages); *but see Duncavage v. Allen*, 497 N.E.2d 433, 442 (Ill. Ct. App. 1986) (Although Illinois Consumer Fraud Act permits court to grant prevailing plaintiff "any relief which it deems proper," the Act does not explicitly authorize punitive damages, so an action to recover such damages does not survive under the rule of *Nat'l Bank of Bloomington*). In any event, because Mrs. Geschke's claim for punitive damages was not legally impossible at the outset, her lawsuit meets the $75,000 jurisdictional threshold. We therefore proceed to the merits.

### B. The Blood and Plasma Benefit Rider

We review the district court's decision on summary judgment de novo, employing the same methodology as the district court. Summary judgment will be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We view the facts and draw all reasonable inferences therefrom in favor of the nonmoving party. *See Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002). However, to survive summary judgment, the nonmoving party may not rely on mere allegations; he must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-23.

In Illinois, an insurance policy is treated as any other contract and is subject to the same rules of construction. *Horning Wire Corp. v. Home Indem. Co.*, 8 F.3d 587, 589 (7th Cir. 1993) (citing *Dempsey v. Nat'l Life & Accident Co.*, 88 N.E.2d 874, 876 (1949)). Policy language that is clear and unambiguous is accorded its plain, ordinary, and

popular meaning. *Travelers Ins. Co. v. Eljer Mfg., Inc.,* 757 N.E.2d 481, 491 (Ill. 2001); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). Ambiguities should be construed in favor of the insured. *United States Fire Ins. Co. v. Schnackenberg*, 429 N.E.2d 1203, 1205 (Ill. 1981). But "a court should not search for an ambiguity where there is none." *Allstate Ins. Co. v. Smiley,* 659 N.E.2d 1345, 1350 (Ill. 1995). The determination of whether the terms of an insurance policy are ambiguous is made by reference to a reasonable person standard; "the test is . . . what a reasonable person in the position of the insured would understand [the terms] to mean." *Id.* "All the provisions of an insurance contract, rather than an isolated part, should be read together to interpret it and to determine whether an ambiguity exists." *Schnackenberg,* 429 N.E.2d at 1205.

The policy language at issue in this case is contained in the Blood and Plasma Benefit Rider, which by its terms provides benefits for "incurred expenses for the cost of blood or blood plasma." The question here is whether the phrase "expenses for the cost of blood or blood plasma" confers coverage for blood or plasma costs only, or includes additional expenses associated with the transfusion of the blood product. The policy does not define either "blood" or "plasma," but under Illinois law "[a] policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning." *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 846 (Ill. 1995).

Monumental argues that the "blood or blood plasma" language in the policy is clear and unambiguous and that a reasonable person would understand that the phrase refers only to the cost of the blood product itself and not the various additional charges for equipment and services involved in providing the blood to a medical patient undergoing treatment. Mrs. Geschke argues that it is unreason-

able to interpret the rider to cover the cost of blood product but not the services essential for it to be useful. A cancer patient in need of a blood transfusion, she argues, "is not merely handed some blood and told to take it himself as if it were aspirin."

Mrs. Geschke is undoubtedly correct that no cancer patient expects to be handed a pint of blood by medical staff and told to transfuse it himself. But the way medical services are delivered is not the issue here. The issue is whether Monumental contracted with Mr. Geschke to pay not only for the pints of blood or plasma he received but for the various additional costs associated with the delivery of blood to him. We agree with the insurer and the district court that the "blood or plasma" language is clear on its face and covers only the cost of blood or plasma.

Although it is true that blood and blood plasma are of no practical use to a patient without being transfused, it does not follow that the Blood and Plasma Benefit Rider covers more than the cost of the blood or plasma itself, as only the blood products are specifically mentioned in the rider. "Blood" and "blood transfusion" are not synonyms, nor is the latter term subsumed within the former. The dictionary definition of "blood" is "the fluid that circulates in the principal vascular system of vertebrate animals carrying nourishment and oxygen to all parts of the body and bringing away waste products for excretion . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 236-37 (1981). "Plasma" is defined as "the fluid part of blood, or lymph, or milk that is distinguishable from suspended material . . . and that in blood differs from serum." *Id.* at 1732. Nothing in these definitions suggests anything other than what we colloquially refer to as "a pint of blood," nor do they encompass the medical process of transfusion.

The CancerCare Plan at issue here distinguishes the defined benefits included within the policy's coverages from

general "treatment" and "cancer treatment." The policy itself does not generally cover cancer treatment, or any treatment at all; according to the "Cancer Insurance Benefit" provision, the policy pays "benefits according to the Schedule of Benefits for Cancer that manifests itself while the Covered Person is insured under this Policy." A special rider was available that did, under limited circumstances, provide coverage for cancer treatment. Mr. Geschke purchased this rider, called the "Extended Hospital Expenses Benefit Rider." It offered policyholders who purchased the rider a choice: the Plan would pay "Hospital charges for Cancer treatment while a Covered Person is Confined in the Hospital," beginning with the ninety-first day of hospitalization, but only in lieu of all the other benefits provided under the policy. Thus, for policyholders like Mr. Geschke who purchased the Extended Hospital Expenses rider, "cancer treatment" was considered a benefit distinct from all the other defined benefits included in the plan and the other riders. None of the other defined benefits were denominated "treatment" by the policy. This supports the conclusion that the phrase "cost of blood or blood plasma" means the cost of blood or plasma only and not the additional costs associated with treatment-related services such as laboratory testing and transfusion.

Furthermore, if Mr. Geschke's medical bills are any guide at all, the total cost of testing and transfusing the blood products dwarfs the cost of the blood itself by a ratio of roughly 27:1. We must therefore consider whether a reasonable purchaser of this policy would have thought that by paying $31.50 per quarter for "Member & Family" coverage he or she was obtaining coverage not only for blood products but for the full range of services necessary to the transfusion process. Under the Blood and Plasma Rider, the maximum benefit per illness period is $500. However, there is no limit on the benefit for leukemia patients. The parties agree that leukemia treatment generally requires numerous

blood transfusions, and the rider's no-limit benefit for leukemia reflects that reality. But not every purchaser of the rider expects to develop leukemia; some are concerned about other forms of cancer. Given the great disproportion between the cost of blood itself and the costs associated with transfusions, it would be unreasonable for a purchaser of this policy to believe that the $500 maximum in nonleukemia cases covers transfusions as well as blood, for $500 will not pay for the transfusion of a single pint.[2]

Mrs. Geschke maintains that the Illinois Blood and Organ Transaction Liability Act, 745 ILCS §§ 40/1 *et seq.*, supports her reading of the policy because the Act defines blood transfusions as services. The Act reads, in pertinent part:

> The procuring, furnishing, donating, processing, distributing or using human whole blood, plasma, blood products, blood derivatives and products, corneas, bones, or organs or other human tissue for the purpose of injecting, transfusing or transplanting any of them in the human body is declared for purposes of liability in tort or contract to be the rendition of a service.

745 ILCS § 40/2. *See also Brandt v. Boston Sci. Corp.*, 792 N.E.2d 296, 301-02 (Ill. 2003). Mrs. Geschke does not explain why this statute informs our understanding of the phrase "cost of blood or blood plasma" in the insurance rider

---

[2] According to Geschke's October 18, 1999, claim, Geschke incurred the following expenses for blood and plasma on November 5-6, 1998: $82.70 for "IV Drugs," $225.75 for "Med/Sur Supplies," $1,660.36 for "Laboratory," $165.60 for "Lab/Immunology," $45.95 for "OR Services," and $112.65 for "Blood/Store-Proc." The same itemized charges, and others, were broken out in Sherman Hospital's other billings for blood and plasma. (Apparently $112.65 is the hospital's price for one pint of blood, as other "Blood/Store-Proc" charges were often exact multiples of that amount.) Accordingly, the total cost of transfusing one pint of blood on that particular day was $2,263.06.

at issue here. Nor can we see any reason why it should. In *Brandt*, the Illinois Supreme Court described the Act as a response to *Cunningham v. MacNeal Memorial Hospital,* 266 N.E.2d 897 (Ill. 1970), in which the court held that a blood transfusion transaction was the sale of a product for purposes of a strict liability claim. The *Brandt* court noted that the Act overruled *Cunningham* to the extent of precluding warranty and strict liability claims in the context of blood transfusions. *Brandt*, 792 N.E.2d at 301-02. The Act thus has little relevance to the insurance coverage question in this case.

We agree with the district court that the phrase "cost of blood or blood plasma" in the insurance rider is unambiguous and includes only the cost of the blood product itself. Monumental did not breach its contract by declining to pay the administrative, testing, transfusion, and other charges associated with the administration of the blood products.

### C.  Common Law and Statutory Fraud Claims

The elements of a common law fraud claim in Illinois are: (1) a false statement of material fact made by the defendant; (2) the defendant knew the statement was false; (3) the defendant intended for the false statement to induce the plaintiff to act; (4) the plaintiff relied upon the truth of the statement; and (5) the plaintiff suffered damages as a result of his reliance on the statement. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996). Mrs. Geschke has not come forward with any evidence that either defendant made a false statement to her husband or affirmatively misrepresented the scope of coverage provided by the Blood and Plasma Benefit Rider. Mrs. Geschke's argument rests on the rider's language and her contention that the defendants failed to explain that it did not cover all transfusion-related costs. We have concluded that the policy language unambig-

uously covers only the cost of the blood or blood plasma itself; clear and unambiguous policy language cannot form the basis of a fraud claim. Accordingly, the common law fraud claim was properly dismissed.

The elements of a claim under the ICFA are: (1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; (4) the plaintiff suffered actual damage; and (5) the damage was proximately caused by the deception. *Oliveira v. Amoco Oil. Co.*, 776 N.E.2d 151, 160 (Ill. 2002). As with her common law fraud claim, Mrs. Geschke's ICFA claim is premised upon the policy itself and not on any statements or actions by either defendant in connection with the sale of the policy. The blood and plasma rider is not itself deceptive. Summary judgment in favor of the defendants on the ICFA claim was therefore appropriate.

For the foregoing reasons, the decision of the district court granting summary judgment to the defendants is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*