In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-2535

RICHARD L. ALEXANDER,

*Plaintiff-Appellant,*

*v.*

CITY OF SOUTH BEND, SOUTH BEND POLICE
DEPARTMENT, DARRELL GUNN, individually and
as Chief of the South Bend Police Department, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 02 C 397—**Christopher A. Nuechterlein**, *Magistrate Judge.*

ARGUED JANUARY 5, 2005—DECIDED JANUARY 3, 2006

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Wrongly convicted of attempted
rape and several other crimes, Richard Lee Alexander
("Alexander") was sentenced to seventy years in prison
but released after five when newly discovered DNA evi-
dence exonerated him. Shortly after his release, Alexander
sued the City of South Bend, Indiana, its police department,
its police chief, and several officers. Alexander alleged that
South Bend and its officers violated his constitutional rights
by conducting a flawed criminal investigation that led to his
wrongful conviction. *See* 42 U.S.C. §§ 1983, 1985, and 1986.

He accused the officers of conducting faulty photo arrays and a suggestive lineup, destroying evidence, and conspiring to arrest him on the basis of race, and South Bend of failing to train and supervise its officers. The district court granted summary judgment in favor of South Bend and its officers on all counts. We affirm.

## I.  Background

The parties' attorneys have not presented the factual background of this case in a clear and well-organized way; the district court characterized Alexander's pleadings as "poorly written, convoluted, and confusing," and the same is true of his appellate briefs. As best we can reconstruct it, here is the story told most favorably for Alexander (which is how we must view it on review of a summary judgment against him). *Geschke v. Air Force Ass'n*, 425 F.3d 337, 342 (7th Cir. 2005).

In the spring and summer of 1996, a series of sexual assaults occurred in the River Park neighborhood of South Bend, Indiana. South Bend police interviewed victims and witnesses, but because the attacks occurred at night, no one had clearly seen the attacker's face. Working with few leads, the police department put together a task force to investigate the rapes. Police did their best to create a composite sketch of the suspect—a young, black male—and officers were told the suspect may be traveling around the River Park neighborhood on a bicycle.

In the early morning hours of July 24, 1996, Alexander was riding his bicycle through the River Park neighborhood when he was stopped by police because he met the general description of the suspect. Alexander denied any connection with the sexual assaults. The officers photographed Alexander and his bicycle and, after Alexander refused to surrender a blood sample, let him go. The police later stopped at least two other black males in the River Park neighborhood

(one of whom was riding a bicycle) in connection with the assaults.

In the hope of having the perpetrator identified, the police showed victims and witnesses several photo arrays. The police asked at least three of the victims to look at either Alexander's photo or an array containing his photo; not one identified him as her attacker. Even the one victim who had been face-to-face with her attacker could not identify him—she, too, had been attacked in the dark and her attacker wore a hood.

Two witnesses, on the other hand, identified Alexander in photo arrays, though with differing levels of certainty. Sylvia Agnone had witnessed an attack in late May 1996 from her apartment. In early June an officer showed her two photo arrays. Agnone picked out a man named Jeffrey Garza, indicating that she was 70% sure he was the perpetrator. After police stopped Alexander in River Park in late July, they showed Agnone another photo array, this one including Alexander's picture. Agnone did not identify anyone. In August 1996 Agnone viewed a third photo array, again including Alexander. This time she picked Alexander and claimed to be sure that he was the attacker because of his facial features, though she had never described the attacker's facial features to the police.

Police also asked Michael Ditsch, another witness and the fiancé of one of the victims, if he could identify the attacker. Ditsch was with his fiancée the night she was assaulted. Ditsch had been approached from behind by the attacker. He was frisked and forced to lie on the ground; his glasses were knocked off in the commotion. Shortly after the attack, Ditsch described the assailant to police: a dark-skinned black male about 5'9" tall, long face, no beard or mustache, wearing a hood. Later, when shown a 1991 mug shot of Alexander, Ditsch identified him as the attacker.

Police arrested Alexander and made him participate in a lineup with five other men. Several of the men in the lineup did not match certain aspects of descriptions given by witnesses. Besides that, there were some dissimilarities among the men who stood in the lineup: all were black males, but their heights, builds, and hairstyles were somewhat different, and two wore different-colored shirts from the rest. The lineup participants were asked to repeat several phrases that the attacker had used. Nine of the victims and witnesses viewed the lineup together; apparently several identified Alexander, although his briefs are not specific on this important point.

Alexander was charged with numerous crimes against multiple victims, including one count of rape and two counts of attempted rape. Before trial, the prosecutor dropped the charges associated with the rape because DNA evidence from the victim's rape kit showed that Alexander had not committed that crime. Although the test results excluding Alexander were kept on file, the rape kit itself was destroyed. Alexander's first trial resulted in a hung jury; a second jury acquitted him of some charges but convicted him of attempted rape and other offenses associated with the attacks on two of the victims. Alexander's briefs do not describe the pretrial proceedings or the trial. Alexander was sentenced to seventy years in prison.

The attacks in River Park did not end with Alexander's arrest and conviction, and police continued to investigate the crimes. Eventually new DNA evidence surfaced that proved Alexander had not committed the attacks for which he was convicted. In December 2001 the prosecutor for St. Joseph County, Indiana, and the public defender's office filed a joint motion to vacate Alexander's convictions. After more than five years in prison for crimes he did not commit, Alexander was released.

Not long after his release, Alexander sued the City of South Bend and a number of its police officials for violation of his constitutional rights under color of state law. *See* 42 U.S.C. § 1983. The district court granted summary judgment for the defendants on all claims, and Alexander appealed.

## II. Discussion

Alexander argues that South Bend and its police officers, in both their individual and official capacities, violated his constitutional rights in essentially four ways: (1) through investigative shortcomings, including faulty photo arrays, flawed witness interviews, and a suggestive lineup; (2) by destroying evidence; (3) by conspiring to arrest Alexander because of his race; and (4) by failing to train and supervise officers properly. With the exception of the fourth argument, which is a *Monell* claim against the City of South Bend alone, there is no need to distinguish between the individual capacity claims and official capacity claims against the various defendants because Alexander has failed to identify a constitutional violation on the part of *any* actor or produce the most basic evidentiary support for his claims. For that reason, we refer to the defendants collectively as "South Bend."

Summary judgment standards are familiar. We review a grant of summary judgment de novo, applying the same methods as the district court. *Sartor v. Spherion Corp.*, 388 F.3d 275, 277 (7th Cir. 2004). We will affirm a summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "material fact" is one that might affect the outcome of the suit, given the relevant substan-

tive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact exists when a reasonable juror could find that the evidence supports a verdict for the nonmoving party. *Id.* We consider all facts and draw all reasonable inferences in favor of Alexander, the nonmoving party. *Sartor*, 388 F.3d at 278. But if South Bend can show the absence of some fact that Alexander would have to prove at trial, Alexander must come forward with evidence (not merely allegations) to show that a genuine issue exists. *Id.*; *see also Celotex*, 477 U.S. at 322-23 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.").

## A. Investigative Flaws

The first of Alexander's claims centers on a number of alleged flaws in the criminal investigation that led to his conviction. He contends that in their zeal to solve the River Park sexual assaults, the task force officers improperly interviewed witnesses and carelessly conducted photographic and lineup identification procedures. The implication is that South Bend's sloppy identification techniques suggested to victims and witnesses that Alexander was the man who committed these crimes. The district court held that Alexander failed to identify evidence of any constitutional violation. The district court was correct.

The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality. *See Hensley v. Carey*, 818 F.2d 646, 648, 650 (7th Cir. 1987). It does, however, guarantee the right to a fair trial—in this context, via the due process clause of the Fourteenth Amendment—and that right is violated if unduly suggestive identification techniques are allowed to

taint the trial. *See Manson v. Brathwaite*, 432 U.S. 98, 113 & n.13 (1977) ("Unlike a warrantless search, a suggestive preindictment identification does not in itself intrude upon a constitutionally protected interest."); *Hensley*, 818 F.2d at 648. The *Brathwaite* standard for evaluating the admissibility of identification evidence focuses on whether the identification procedure was unduly suggestive and whether the resulting identification is reliable. *Brathwaite*, 432 U.S. at 113-14. Both suggestiveness and reliability are evaluated by reference to the totality of the circumstances. *Id.*

Grounded in due process, the constitutional interest implicated in challenges to police identification procedures is *evidentiary* in nature. *Id.* at 113 n.14; *Hensley*, 818 F.2d at 648. Thus, we recognized in *Hensley* that the *Brathwaite* rule regarding unduly suggestive identification procedures "is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of that core right and not the prophylactic rule that should be actionable under § 1983." *Hensley*, 818 F.2d at 649. Accordingly, South Bend cannot be liable under § 1983 unless Alexander shows how the flaws in South Bend's identification techniques made his trial unfair. *See id.* ("Hensley has no claim under § 1983 arising out of his participation in an unduly suggestive lineup since he was not deprived of his right to a fair trial.").

But Alexander has told us almost nothing about his trial. He has only very generally asserted that some of the witnesses who viewed the photo arrays and lineup testified. This is insufficient to forestall summary judgment. *Hensley*'s point is this: flawed identification procedures are not themselves constitutional violations; plaintiffs must show *how* those flawed procedures compromised the constitutional right to a fair trial. What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the

identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime? Each of these factors—the list is illustrative, not exhaustive—have a bearing on whether a fair trial was had.

In *Hensley* there was never a trial—charges were brought against Hensley following an allegedly suggestive lineup but were dropped before trial. *Id.* at 647. The due process right was therefore not implicated, and we affirmed a summary judgment dismissing Hensley's claim. Here, of course, there was a trial, but that distinction alone is not enough to carry Alexander's burden. A plaintiff with this kind of claim must demonstrate, by reference to the *Brathwaite* standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial. Hensley could not do it because he was never tried; Alexander has not done it (even if he could have). Simply saying that a witness was shown a suggestive photo array or lineup and later testified is not enough. That Alexander was later exonerated does not, without more, make his case that a due process violation has occurred.

Alexander has come up short because he has not made any effort to describe how the police identification procedures tainted his trial. He has not identified or produced the relevant portions of the trial transcript or even described the pertinent trial testimony or evidence. He has recited a litany of poor investigative practices, but his argument is scattershot and does not direct us to anything that occurred during the pretrial or trial proceedings in the prosecution against him. Photos of the lineup and photo array are in the record, but without the corresponding trial testimony from the police, victims, and

eyewitnesses, we cannot conduct the appropriate legal analysis.

It is telling that Alexander did not move to suppress or otherwise object to the introduction of the identification evidence on grounds of unconstitutional suggestiveness. Without the trial record we cannot determine whether such a motion, had it been made, would or should have been granted. The photos of the lineup and photo array do not depict identification procedures so obviously suggestive and unreliable as to establish, by themselves, a constitutional violation. For its part, South Bend notes that the victims and eyewitnesses were extensively cross-examined. Alexander's is a sympathetic case, but we cannot connect the dots for him. That he must do on his own. *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument.").

## B. Destruction of Evidence

Alexander also maintains that South Bend violated his constitutional rights by destroying evidence. Before his trial began, a DNA analysis of samples in a rape kit excluded Alexander as the assailant in the attack on one of the River Park rape victims. After receiving the results of the DNA analysis, South Bend threw out the rape kit and the prosecutor dropped those charges. Alexander contends that his right to the preservation of evidence was violated when South Bend destroyed the rape kit. The argument is a curious one, both because the charges against Alexander on that attack were dismissed and because the results of the DNA tests were preserved. It is unclear how Alexander could have suffered an injury by the destruction of evidence related to a crime for which he was not tried, particularly when the results of tests on the evidence, which are all that is probative, prove his innocence. Although the destruction

of the rape kit caused a delay in his trial, he remained in pretrial custody on the other charges against him and suffered no independent harm as a result of the delay.

## C. Conspiracy

Alexander's conspiracy claim—that South Bend arrested him because he is black—fails for complete lack of evidentiary support. In order to establish a civil conspiracy under § 1985, Alexander must show that an actual conspiracy existed (in other words, that people agreed to injure him), that its purpose was to deprive Alexander of his constitutional rights, that an act was committed in furtherance of the conspiracy, and that he was injured. *See Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002). Alexander must also show a racial animus driving the conspiracy. *Id.* A conspiratorial agreement may be established by circumstantial evidence, but only if a reasonable jury could conclude that the conspirators had, in fact, reached an understanding that they sought to injure Alexander. *Id.*

Alexander points out that the police picked up at least three black men in connection with these attacks, that the officers made phone calls to one another (sometimes even when one officer was off duty), and that the lineups and photo arrays were suggestive. He also notes that the police did no surveillance of his residence. It is true that the police stopped and investigated Alexander because he is black, but this was not because of any racial animus. Instead, the description of the attacker was one of a black male. The police stopped Alexander because he fit the general description of the black male they were looking for. There is no evidence that South Bend was seeking black males of a certain description for discriminatory reasons rather than legitimate ones. The phone calls among officers are nothing more than evidence that the officers remained in contact as they investigated the crimes; without more, to

conclude that such phone calls establish a conspiracy is the purest of conjecture. *See Goetzke v. Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002) (noting that evidence of phone calls between alleged conspirators, standing alone, is indicative only of the fact that the individuals stayed in touch). Alexander has failed to point to any evidence that suggests a conspiracy was afoot or that anyone was motivated by racial animus.

### D. *Monell* Claim

Finally, Alexander argues that the City of South Bend is liable because it has a policy or custom of inadequately training and supervising its police officers, *see Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690-91 (1978), which led to improper identification procedures, destruction of evidence, and racial conspiracies. This argument need not detain us long. South Bend cannot be liable under *Monell* unless it violated a constitutional guarantee. *Contreras v. City of Chicago*, 119 F.3d 1286, 1294 (7th Cir. 1997). We have concluded that Alexander has not created a triable issue on whether a constitutional violation occurred.

Even if Alexander had shown a constitutional violation, *Monell* requires him to show that South Bend adopted a policy or had a custom of poor training or inadequate supervision. *Monell*, 436 U.S. at 694. Alternatively, Alexander could show that South Bend's failure to train or supervise its officers amounted to deliberate indifference to the rights of people with whom the police came in contact. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). Alexander has cited no evidence of a custom or policy or of deliberate indifference. The sum total of Alexander's accusations is that South Bend's police manual had no information on how to conduct proper witness interviews, photo arrays, or lineups, and that South Bend made several

errors handling his case. Allegations about what is not in the manual hardly establish that South Bend adopted a policy or had a custom of suggestive interviews, photo arrays, or lineups, or that it was indifferent to people's rights. In addition, the shortcomings in this investigation are not indicative of a custom or policy; rather, they are indicative of one flawed investigation. Alexander cites to no other suggestive lineups or photo arrays, no other conspiracies against blacks, and no other incidents of destroyed evidence. Alexander's *Monell* claim fails for a complete absence of evidentiary support.

For the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*