In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1568

RASHAD B. SWANIGAN,

*Plaintiff-Appellant.*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 4780 — **Virginia M. Kendall**, *Judge.*

ARGUED MAY 31, 2017 — DECIDED FEBRUARY 2, 2018

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge*. While on the lookout for a serial bank robber, Chicago police officers misidentified Rashad Swanigan as the perpetrator, arrested him, and detained him for approximately 51 hours without a probable-cause hearing. He was released when the state prosecutor decided not to press charges, and police later found the true culprit.

Swanigan sued the officers involved in his arrest and de-
tention under 42 U.S.C. § 1983 alleging various constitutional
violations. He later filed a related suit against the City
raising *Monell* claims. The suits were consolidated but
maintained separate case numbers and dockets, and the
district judge stayed the *Monell* suit to allow the suit against
the officers to proceed on its own. A jury found for Swanigan
on a single claim—for unconstitutionally prolonging his
detention—and awarded $60,000 in damages. Swanigan then
moved to lift the stay on his suit against the City. The judge
denied the motion and dismissed the suit entirely, ruling
that Swanigan waived most of his claims and that the others
were not justiciable. We vacated the dismissal order as
premature and remanded with instructions to allow
Swanigan to amend his complaint. *Swanigan v. City of
Chicago*, 775 F.3d 953 (7th Cir. 2015).

With the stay lifted, Swanigan filed an amended com-
plaint alleging constitutional injuries stemming from three
police-department policies: (1) a "hold" policy by which the
officers kept him in custody; (2) a policy of requiring detain-
ees to participate in police lineups; and (3) a policy regard-
ing the contents of the closed case file that continued to label
him as the bank robber. The judge dismissed the *Monell* suit
in its entirety.

We affirm. Swanigan cannot recover twice for the pro-
longed detention, and his other claims have no basis in
federal law. The Constitution has nothing to say about
unreliable police lineups that don't taint a trial. Neither does
the Constitution address reputational harm from false or
misleading police reports. And Swanigan lacks standing to

pursue injunctive or declaratory relief because the challenged policies are unlikely to harm him in the future.

## I. Background

Our earlier opinion contains a more complete description of the facts and procedural history of the case; the following is a condensed version. After cashing checks at a Chicago bank in August 2006, Swanigan was stopped by two Chicago police officers looking for the "Hard Hat Bandit," who was known to rob banks while wearing a yellow hard hat. After learning that Swanigan's automobile registration was suspended, the officers searched the car and found a knife—and a yellow hard hat. (Swanigan kept the knife in his car to peel produce, and the hard hat was required for his job as a construction worker.) Thinking Swanigan was the Hard Hat Bandit, the officers arrested him for traffic violations and unlawful use of a weapon and took him to the police station.

Three hours into the detention, officers placed a "hold" on Swanigan in order to keep him at the station while detectives investigated him for a robbery linked to the Hard Hat Bandit. While in custody the police used Swanigan as a filler in lineups for other investigations and as the target in lineups investigating the Hard Hat Bandit robbery. Several witnesses identified Swanigan as the robber.

On the second full day after Swanigan's arrest, a state prosecutor assessed the case. She decided not to charge Swanigan for the robbery after concluding that the identifications were suspect. After 51 hours of detention without a probable-cause hearing, Swanigan was released.

A month later police entered a final notation into Swanigan's case file: "Cleared—closed other exceptional."

Swanigan contends that because the police department assigns the cleared-closed notation to the offender's file after solving a crime, the designation labels him as the Hard Hat Bandit. Although "other exceptional" conveys that he wasn't prosecuted, the file's narrative account lists the reasons that the police initially thought he was the perpetrator. And no change was made to Swanigan's file after the police arrested the real Hard Hat Bandit. Swanigan contends that the case file continues to cast suspicion on him as the Hard Hat Bandit, giving rise to possible reputational harm and police bias against him.

Swanigan's first lawsuit named 20 officers and the City as defendants and alleged nine separate constitutional and state-law claims. Late in the litigation Swanigan tried to add a *Monell* claim against the City, but the judge wouldn't allow the amendment. So he filed a new freestanding *Monell* action against the City, which was promptly consolidated with the first suit and stayed pending the disposition of the claims against the officers. Partial summary judgment narrowed the scope of the litigation, and a jury eventually found that the officers had probable cause to arrest Swanigan at the bank but that they unconstitutionally prolonged his detention. *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) (holding that a detention lasting longer than 48 hours without a judicial determination of probable cause is presumptively unreasonable under the Fourth Amendment). In the end, seven officers were held liable for the unduly long detention. The jury awarded $60,000 in compensatory damages.

In the related *Monell* suit against the City, Swanigan alleged constitutional injuries arising from nine separate policies. After our remand, Swanigan trimmed his complaint

in light of the jury's verdict. The amended version centered on the police department's hold policy, its lineup policy, and its policy regarding cleared-closed case reports. The City moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The judge granted the motion, and the case now returns to us for further review.

## II. Discussion

We review the judge's dismissal order de novo.[1] *Roake v. Forest Pres. Dist. of Cook Cty.*, 849 F.3d 342, 345 (7th Cir. 2017). Questions of standing are appropriately addressed via a motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction. *Berger v. NCAA*, 843 F.3d 285, 289 (7th Cir. 2016). A case is properly dismissed under Rule 12(b)(6) if the complaint does not "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Section 1983 provides a claim against a person acting under color of law who deprives another of a federal right. 42 U.S.C. § 1983. A municipality is subject to § 1983 liability if one of its policies caused the plaintiff's harm. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).

---

[1] We reject Swanigan's contention that the judge abused her discretion by taking judicial notice of the facts recited in our first *Swanigan* opinion. Our factual narrative rested on the trial record, and Swanigan doesn't dispute any part of it. If "the finding taken from the prior proceeding is not subject to reasonable dispute, then the court has satisfied the evidentiary criteri[on] for judicial notice." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997) (quotation marks omitted).

### A. Hold Policy

Federal common law prevents § 1983 plaintiffs from re-covering twice for the same injury. *Janusz v. City of Chicago*, 832 F.3d 770, 774 & n.1 (7th Cir. 2016). That means Swanigan cannot recover from the City for the prolonged detention because he was compensated for that constitutional violation in his suit against the officers.

Attempting to evade the double-recovery rule, Swanigan contends that his detention occurred in three distinct stages: (1) the arrest; (2) the three hours at the police station before the hold was issued; and (3) the two days at the station after the hold was placed. Because the seven officers found liable for the detention each arrived during the third stage, Swanigan argues that he hasn't been compensated for the arrest and first three hours.

That argument falls flat. First, a jury found that the officers lawfully arrested Swanigan, and the City can't be liable "based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (observing that a municipality cannot be found liable under *Monell* when "such a finding would create an inconsistent verdict") (emphasis omitted).

The City isn't liable for the first three hours at the station either. Swanigan cannot carve out particular hours from his detention as separately compensable. He faced a single detention, not multiple detentions, and he's entitled to only one recovery though different constitutional theories support liability and different officers were involved. *See Bosco*

*v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987) ("[O]nce the plaintiff has been fully compensated for his injuries by one or more of the tortfeasors, he may not thereafter recover any additional compensation from any of the remaining tortfeasors.") (quotation marks omitted).

Moreover, even if Swanigan could split the detention into separate segments, he'd still encounter two problems. First, nothing suggests that the City's hold policy caused the *prehold* detention. That's fatal: In a *Monell* case, "[t]he central question is always whether an official policy … caused the constitutional deprivation." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). Second, *McLaughlin* establishes that detentions lasting less than 48 hours are presumptively lawful and cannot be challenged on the basis of the timespan alone. 500 U.S. at 56. Some additional factor, like animus toward the detainee, must be present to rebut the presumption. *Id.* No additional factor is present here, so even if we considered the first three hours in isolation, the claim is doomed.

That rules out monetary relief, but Swanigan also seeks an injunction against the hold policy. That request additionally fails for lack of standing, which is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see* U.S. CONST. art. III, § 2, cl. 1. Because an injunction is a forward-looking remedy, a plaintiff seeking this form of relief has standing to sue for an alleged future injury only if "the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)) (internal

quotation marks omitted). "[P]ast injury alone is insufficient," as is a threat of injury that is "merely conjectural or hypothetical." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (quotation marks omitted).

The injury Swanigan forecasts—he says he *might* be pulled over, arrested, and again subjected to an unconstitutionally long detention—is layered with hypothetical and nowhere near certain. That's particularly true because we assume that Swanigan will conform his conduct to the requirements of the law and avoid arrest altogether. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974). Without a showing of "a sufficient likelihood that he will again be wronged in a similar way, [Swanigan] is no more entitled to an injunction than any other citizen." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).[2]

**B. Lineup Policy**

During his detention, Swanigan was placed in several lineups, and four eyewitnesses misidentified him as the Hard Hat Bandit. His claim for damages against the City rests on the Due Process Clause of the Fourteenth Amendment. He alleges that the lineups were conducted improperly and led to unreliable identifications.

This argument goes nowhere because the mistaken identifications were never admitted in a trial. "[T]he constitutional interest implicated in challenges to police identification procedures is *evidentiary* in nature." *Alexander*

---

[2] Swanigan's claim for declaratory relief fails for the same reason. *See Feit v. Ward*, 886 F.2d 848, 857 & n.11 (7th Cir. 1989) (holding that claims for declaratory relief, like claims for injunctive relief, require ongoing or impending harm).

*v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006). Specifically, the due-process right to a fair trial requires exclusion of unreliable eyewitness identifications procured through police misconduct. *Perry v. New Hampshire*, 565 U.S. 228, 238–40 (2012) (synthesizing cases). But a misidentification "does not in itself intrude upon a constitutionally protected interest." *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13 (1977). In this case Swanigan "could not possibly have been deprived of his right to a fair trial since he was never tried." *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987).

Trying a different route, Swanigan inventively describes his coerced participation in lineups as an unconstitutional "seizure within a seizure." There's no such thing. A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (quotation marks omitted). Being placed in a lineup while in custody "does not curtail a person's freedom of action" because he has "already lost that freedom." *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989). Suspects are given any number of compulsory instructions while seized, and Swanigan's logic would turn each command into a new seizure. That's plainly wrong. A person can't be seized while seized any more than he can jump while jumping. He's either seized or not; he isn't extra seized when forced to sit in a police car or stand in a lineup.

## C. Cleared-Closed Case Policy

Finally, Swanigan claims that the police department's policy regarding cleared-closed case files violates his constitutional rights by continuing to label him as the Hard Hat Bandit. He alleges that the policy harms him in two ways.

First, because the public can access the record with a Freedom of Information Act request, he might suffer reputational harm. Second, if he is stopped by police, even for a routine traffic matter, the officer might use the misleading case report against him. Swanigan grounds this claim in the Due Process Clause and seeks damages and an injunction expunging the record.

The City responds that the case file doesn't actually label Swanigan as the Hard Hat Bandit because it accurately reports that the prosecutor declined to pursue charges based on the unreliable identifications. This argument overlooks the difference between "not guilty" and "innocent." If Swanigan is correct that the record could be read as continuing to link him to the Hard Hat Bandit robbery, a reader could reasonably surmise that he committed the crime but the prosecutor simply couldn't prove it beyond a reasonable doubt. That, of course, isn't the truth.

Swanigan's real problem is that the claim has no legal anchor. The potential for public stigma isn't cognizable as a due-process violation because reputational harm doesn't deprive a person of life, liberty, or property. *See Paul v. Davis*, 424 U.S. 693, 712 (1976). And it's entirely speculative to suggest that a police officer might use the cleared-closed file to violate Swanigan's rights in some unknown way in some hypothetical future traffic stop. For these reasons, Swanigan has neither a legal hook for this claim nor standing to seek an injunction.

AFFIRMED.

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part. The good news for plaintiff Swanigan came several years ago, when a jury awarded him $60,000 for the violation of his constitutional rights by his prolonged detention after his arrest, which had been lawful but mistaken. The issue in this separate *Monell* suit is whether Swanigan should be allowed to seek further relief in the form of additional damages or an injunction. I agree with my colleagues that Swanigan is not entitled to additional damages based on what has been called the "hold past court call" policy or on his having been included in line-ups while he was in custody.

I also agree that Swanigan does not have standing to seek an injunction against the "hold past court call" policy. Versions of this policy have been under constitutional attack for a generation. After a district judge declared the policy unconstitutional in 1986, the city immediately rescinded the policy, at least formally. *Robinson v. City of Chicago*, 868 F.2d 959, 962 (7th Cir. 1989). Yet cases involving the same practice continue, as in Swanigan's case. See, e.g., *Lopez v. City of Chicago*, 464 F.3d 711, 721–22 (7th Cir. 2006) (reversing dismissal of claim for prolonged post-arrest detention for investigation); *Willis v. City of Chicago*, 999 F.2d 284, 288–89 (7th Cir. 1993) (affirming finding that prolonged post-arrest detention for investigation, before *Robinson* was decided, violated Fourth Amendment), citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).

Swanigan cannot obtain an injunction against future application of the "hold past court call" policy or practice to him. He has not shown a substantial risk that the city will apply this policy or practice to him in the future, at least not without relying on an "attenuated chain of inferences" that impermissibly assumes future illegal state action. See *Clapper v. Amnesty*

*Int'l USA*, 568 U.S. 398, 414 n.5 (2013); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

I respectfully dissent, however, from the decision to affirm dismissal of Swanigan's challenge to the "cleared-closed case" policy. He alleges that the Chicago Police Department maintains a file on him that effectively—but falsely—identifies him as the "Hard Hat Bandit." This is not a case where the police suspected him of those crimes but were unable to prove guilt beyond a reasonable doubt. There is no doubt here, as my colleagues acknowledge. Swanigan was not the Hard Hat Bandit. In my view, he has standing to raise this claim, and on the merits he should be allowed to proceed past the pleadings.

On this issue of standing, Swanigan can show that he is at "substantial risk" of being harmed by the "cleared-closed" policy. "Substantial risk" is the correct standard. See *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) ("allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" the harm will occur.'"), quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). On standing, the majority asserts that "it's entirely speculative to suggest that a police officer might use the cleared-closed file to violate Swanigan's rights in some unknown way in some hypothetical future traffic stop." Ante at 10. I respectfully disagree. There remains a substantial risk that harm will befall Swanigan, and, unlike with his challenge to the "hold past court call" practice, without having to assume intentional wrongdoing by either Swanigan or police officers.

To begin with, the chances that Swanigan will be subjected to just a routine traffic stop are actually quite high. Over a period of several years, the same is true for any random civilian

driver. In just one year, police stopped more than ten percent of all drivers nationwide. U.S. Dep't of Justice, Bureau of Justice Statistics, *Police Behavior During Traffic and Street Stops, 2011*, at 3, tbl. 1, https://www.bjs.gov/content/pub/pdf/pbtss11.pdf. For all black drivers, that percentage was higher, at 12.8 percent. *Id.* Over a five-year period, the chance that a given black driver will be pulled over is approximately 50 percent. $(0.872^5 = .504)$.[1] Over ten years, the chance increases to about 75 percent. $(0.872^{10} = 0.254)$.[2] Cf. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) (applicant for asylum facing ten percent chance of persecution in country of origin would have "well-founded fear of being persecuted" for purposes of immigration law).

Next, consider how any traffic stop of Swanigan in Chicago is likely to unfold as long as the false information is in his police file. When the police carry out a traffic stop, they are entitled to demand the driver's identification, of course,

---

[1] These rough calculations assume that no variable would cause certain drivers to be pulled over more than others. I am under no illusions that these "ideal" conditions prevail in the real world, but I doubt that any such variables would alter these estimates so dramatically as to make Swanigan's risks insubstantial.

[2] In Chicago, the racial disparity may be higher. According to a State of Illinois study of traffic stop data, more than 76 percent of all traffic stops conducted by Chicago police involve minority drivers. Illinois Dep't of Transp., Illinois Traffic Stop Study Statewide & Agency Reports 2015, at 146, https://idot.illinois.gov/transportation-system/local-transportation-partners/law-enforcement/illinois-traffic-stop-study. Nearly half of all traffic stops in the city involve black drivers. *Id*.

and it is routine to check the driver's record for active warrants, driving history, and criminal history. Those checks are done for important reasons, including officer safety.

If the files are checked, the officer checking Swanigan may well be told that the police department believes he committed a series of armed robberies. At that point, an officer's normal caution will give way immediately to extreme caution, putting Swanigan at a much higher risk that any movement might be misinterpreted as dangerous. And note that this scenario assumes lawful and reasonable actions by both Swanigan and a police officer. How many cases have we seen in this country of unarmed subjects, especially men of color, being shot and even killed by police based on hair-trigger responses to innocent actions? In my view, these risks for Swanigan—today—are not speculative but substantial. He has alleged, and should be allowed to prove, that he has standing to challenge the "cleared-closed case" policy as applied to him.

On the merits of this claim, Swanigan would face a challenge. Ordinarily a civilian has no cognizable legal interest in what police investigative files say about him. *Paul v. Davis*, 424 U.S. 693, 697 (1976), held that even a *public* accusation by the police that a civilian was an "active shoplifter" did not violate the due process clause of the Fourteenth Amendment. But what Swanigan alleges here is an extreme case with substantial risk of tangible harm not present in that case. And there is virtually nothing to be said here for the integrity of the police files. At this point, after the conviction of the real Hard Hat Bandit, the police refusal to correct the files falsely labelling Swanigan the Hard Hat Bandit is arbitrary and capricious—and dangerous.

Constitutional law (not to mention common sense) establishes that the police are *entitled* to rely on such information in their files, e.g., *DeLuna v. City of Rockford*, 447 F.3d 1008, 1011–12 (7th Cir. 2006) (use of deadly force was reasonable based in part on officer's knowledge of suspect's history of violence and weapons), even if it turns out to be mistaken. See, e.g., *Herring v. United States*, 555 U.S. 135, 146 (2009) (exclusionary rule not applicable to arrest based on mistaken information about active warrant); *Catlin v. City of Wheaton*, 574 F.3d 361, 365–66 (7th Cir. 2009) (police acted reasonably in tackling man they mistakenly believed was armed and dangerous felon who had announced his intention to flee or fight rather than be arrested). Note, however, that in *Herring* the Supreme Court assumed that police reliance on knowingly false, or even recklessly or systematically mistaken, information would not be reasonable. 555 U.S. at 146.

Based on Swanigan's allegations, it is hard to understand how the false information that is still in his police file is the product of anything other than knowing falsity or deliberate indifference to the truth. Why not allow a civilian who faces substantial risk of harm due to false police information an opportunity to have that information corrected?

And on the other side of the scales, what harm would the Chicago police or public suffer if the plainly false information were corrected? Again, that information is not just unproven or contestable—it is false. I cannot think of any harm such a correction would cause the police, and it might well help avoid a tragedy. I would allow Swanigan to pursue this claim on the merits beyond the pleadings so that the courts could address it and its potential ramifications based on real evidence rather than allegations and theoretical arguments.