In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2526

NICHOLAS WEBB, *et al.*,

*Plaintiffs-Appellants*,

*v.*

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-04664 — **Andrea R. Wood**, *Judge*.

ARGUED FEBRUARY 6, 2018 — DECIDED MAY 8, 2018

Before RIPPLE, SYKES, and BARRETT, *Circuit Judges*.

BARRETT, *Circuit Judge*. The parties cast this case as one about arbitral immunity, which is the ground on which the district court dismissed the complaint. It turns out, however, that the case is really about federal jurisdiction. We asked the parties to submit supplemental briefs on this question, and they both contend that subject matter jurisdiction exists. Their strongest argument is grounded in the diversity statute, but the amount in controversy requirement presents an

obstacle: the complaint satisfies it only if Illinois law permits the plaintiffs to recover their legal expenses from the underlying arbitration, this suit, or both. We conclude that while Illinois law permits the recovery of legal fees as damages in limited circumstances, those circumstances are not present here.

## I.

In October 2013, brokers Nicholas Webb and Thad Beversdorf were fired by their employer, Jefferies & Company, Inc. ("Jefferies"). They decided to challenge their termination, and, as their employment contracts with Jefferies demanded, they filed their claims in the Financial Industry Regulatory Authority's ("FINRA") arbitration forum. FINRA required them to sign an "Arbitration Submission Agreement," which they did, and their dispute with Jefferies proceeded in arbitration for the next two-and-a-half years. They withdrew their claims before a final decision was rendered. Under FINRA's rules, that withdrawal constituted a dismissal with prejudice.

After the arbitration failed, Webb and Beversdorf sued FINRA in the Circuit Court of Cook County, Illinois, alleging that FINRA breached its contract to arbitrate their dispute with Jefferies. They faulted FINRA for a number of things, including failing to properly train arbitrators, failing to provide arbitrators with appropriate procedural mechanisms, interfering with the arbitrators' discretion, and failing to permit reasonable discovery. They sought damages "in an amount in excess of $50,000" and a declaratory judgment identifying specified flaws in FINRA's Code of Arbitration Procedure. FINRA removed the dispute to federal court, where it moved to dismiss on multiple grounds, including

arbitral immunity. The district court held that FINRA was entitled to arbitral immunity and dismissed the suit. Webb and Beversdorf appeal this judgment.

## II.

Neither side has raised a jurisdictional challenge, but we have an independent obligation to determine whether we have authority to resolve this dispute. *Smith v. American Gen. Life & Acc. Ins. Co.*, 337 F.3d 888, 892 (7th Cir. 2003) (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 287 n.10 (1938)). At oral argument, we ordered the parties to submit supplemental briefs on this issue. Both sides argue that diversity jurisdiction exists, and FINRA argues that federal question jurisdiction exists as well. Because the argument for diversity is the stronger of the two, we begin there.

The diversity statute, 28 U.S.C. § 1332, grants jurisdiction when there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Complete diversity is not a problem: Webb and Beversdorf are citizens of Illinois and FINRA is a Delaware corporation with its principal place of business in Washington, D.C. Identifying the amount in controversy is more complicated.

After it removed the case to federal court, FINRA initially claimed that the amount in controversy was satisfied because Webb and Beversdorf sought more than $1,000,000 from Jefferies. The district court properly rejected this argument, because we have held that the amount at stake in an underlying arbitration does not count toward the amount in controversy in a suit between a party to the arbitration and the arbitrator. *Caudle v. American Arbitration Ass'n*, 230 F.3d

920, 922–23 (7th Cir. 2000). Jurisdiction turns on what is at stake between the parties to *this* suit—Webb and Beversdorf, the plaintiffs, and FINRA, the defendant.

Webb and Beversdorf paid FINRA $1800 at the start of the arbitration; if that is all they lost, the amount in controversy is obviously far short of the jurisdictional mark. They also, however, seek to recover the legal fees that they incurred both in the course of arbitrating against Jefferies and in preparing this lawsuit against FINRA.[1] Webb and Beversdorf say that these fees—which exceed $75,000—were a reasonably foreseeable consequence of FINRA's breach of the Arbitration Submission Agreement. *See* 24 WILLISTON ON CONTRACTS § 64.12 (4th ed. 2017) ("Consequential damages … include those damages that … were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach."). The district court accepted this argument and concluded that it had authority to adjudicate the suit.

Legal fees may count toward the amount in controversy if the plaintiff has a right to them "based on contract, statute, or other legal authority." *Ross v. Inter-Ocean Ins. Co.*, 693 F.2d 659, 661 (7th Cir. 1982), *abrogated on other grounds by Hart v.*

---

[1] In their supplemental briefs, Webb and Beversdorf stress the legal fees they incurred in "preparing to litigate" against FINRA, presumably because they recognize that the amount in controversy requirement must be satisfied at the time the lawsuit is filed in or removed to federal court. *Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 958 (7th Cir. 1998) ("[J]urisdiction depends on the state of affairs when the case begins; what happens later is irrelevant."). Even if they seek recovery of legal fees incurred after the case was removed, those fees cannot count toward the amount in controversy.

*Schering-Plough Corp.*, 253 F.3d 272, 274 (7th Cir. 2001). Webb and Beversdorf do not contend that FINRA assumed a contractual obligation to cover either the fees that they incurred in arbitration or those that they incurred in this lawsuit. That leaves statute or other authority. The parties agree that Illinois law governs, so we look there to determine whether Webb and Beversdorf could plausibly recover any of these legal fees as damages.

It is clear that Webb and Beversdorf cannot recover the money spent preparing to litigate against FINRA. Illinois generally adheres to the American Rule that each party bears its own litigation costs. *Duignan v. Lincoln Towers Ins. Agency, Inc.*, 667 N.E.2d 608, 613 (Ill. App. Ct. 1996). Its common law does not authorize a prevailing party to recover attorneys' fees from an opponent. *Ritter v. Ritter*, 46 N.E.2d 41, 43 (Ill. 1943); *see also Keefe-Shea Joint Venture v. City of Evanston*, 845 N.E.2d 689, 702 (Ill. App. Ct. 2005). Any right to recovery must derive from contract or statute, *Ritter*, 46 N.E.2d at 43; *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 839 (7th Cir. 2010), and Webb and Beversdorf have not identified any contractual or statutory provision giving them that right. They are thus stuck with the longstanding rule that they must bear their own litigation expenses in this suit against FINRA, even if they ultimately win.

But Webb and Beversdorf do not just seek recovery of the legal fees they have incurred litigating against FINRA; they also seek recovery of the legal fees they incurred arbitrating against Jefferies. This is a more plausible ground for recovery, because Illinois recognizes a "third party litigation exception" to the American Rule. The Illinois Supreme Court has held that "where the wrongful acts of a defendant in-

volve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expense to protect his interest, the plaintiff can then recover damages against such wrongdoer, measured by the reasonable expenses of such litigation, including attorney fees." *Ritter*, 46 N.E.2d at 44; *see also* RESTATEMENT (SECOND) OF TORTS § 914 ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees, and other expenditures thereby suffered or incurred in the earlier action."). While the exception arises more frequently in the context of torts than contracts, we assume that Illinois courts would recognize it in the latter context as well. *See Colvin v. Monticello Communications, Inc.*, No. 91–C–2498, 1994 WL 113051, at *8–9 (N.D. Ill. Apr. 1, 1994) (allowing the recovery of legal fees when the defendant's breach of contract placed the plaintiff in litigation with a third party); *see also City of Cedarburg Light & Water Comm'n v. Glen Falls Ins. Co.*, 166 N.W.2d 165, 168 (Wis. 1969) ("[A] breach of contract as well as tort may be a basis for allowing the present plaintiff to recover reasonable third party litigation expenses."). FINRA—whose desire to be in federal court has motivated it to argue vigorously for a proposition otherwise against its interest—also insists that the "third party litigation exception" to the American Rule applies here and could obligate it to pay for Webb and Beversdorf's legal expenses if it breached the arbitration agreement.

Webb and Beversdorf's effort to recover expenses incurred in an arbitration proceeding begun for its own purposes—to assert a wrongful termination claim against Jefferies—distinguishes this case from those in which Illinois

courts have applied the exception. Illinois courts have not applied the exception when the defendant caused the legal fees to increase in an already existing third-party suit; they have applied it when the defendant caused the third-party suit in the first place. The Illinois courts have invariably described the exception as applying when the defendant's wrong forced the plaintiff into litigation with a third party. *See, e.g.*, *Ritter*, 46 N.E.2d at 44 (holding that the exception applies "where the natural and proximate consequences of a wrongful act have been to *involve the plaintiff in litigation* with others" (emphasis added)); *Philpot v. Taylor*, 75 Ill. 309, 311 (Ill. 1874) (applying exception where the consequence of the defendant's wrongful act "has been to *plunge the plaintiff into a chancery suit*" (emphasis added)); *see also Champion Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1006 (7th Cir. 1989) (noting that the plaintiff can recover attorneys' fees if "one consequence of the tortfeasor's actions is to *involve a person in litigation* with others" (emphasis added)). For example, Illinois courts have permitted plaintiffs to recover legal fees spent settling with an insurance company when the defendant wrongfully caused the company to cancel the plaintiff's policy, *Duignan*, 667 N.E.2d at 613; obtaining refunds of tax penalties that were assessed on the plaintiff due to the defendant's negligence, *Sorenson v. Fio Rito*, 413 N.E.2d 47, 52 (Ill. App. Ct. 1980); and filing a second divorce petition when the defendant's legal malpractice resulted in the dismissal of the plaintiff's first petition, *Nettleton v. Stogsdill*, 899 N.E.2d 1252, 1259 (Ill. App. Ct. 2008). In all of these instances, the third-party litigation existed because of the defendant's alleged wrong.[2] And when the party seeking the recovery of

---

[2] The dissent cites *Certain Underwriters at Lloyd's, London v. Johnson &*

fees was the plaintiff in the third-party litigation, as Webb and Beversdorf were here, the third-party litigation has been undertaken to "cure the damage caused by the defendant." *Duignan*, 667 N.E.2d at 613.

Webb and Beversdorf did not undertake the arbitration to cure FINRA's breach of contract; they undertook it to resolve an employment dispute with Jefferies. FINRA's alleged breach of the arbitration agreement did not force Webb and Beversdorf into arbitration; it allegedly increased

---

*Bell, Ltd.*, No. 10–C–7151, 2011 WL 3757179 (N.D. Ill. Aug. 25, 2011), as persuasive authority for the proposition that Illinois law would permit the recovery of fees not only when the defendant forced the plaintiff into litigation, but also when the defendant increased the plaintiff's expenses in otherwise existing litigation. It is, of course, the decisions of Illinois courts that control our interpretation of Illinois law. In any event, however, *Certain Underwriters* is consistent with our view of Illinois law. There, an insurer brought a legal malpractice action against a law firm that represented it in two underlying suits. The district court held that Illinois law would permit the plaintiff to recover attorneys' fees in one of the underlying suits based on the plaintiff's allegation that "it would not have undertaken its representation of [the insured] in the underlying … lawsuit but for defendants' advice." In other words, but for the defendants' negligence, the plaintiff would not have been involved in the third-party litigation. *Id.* at *5. The district court also held that Illinois law would permit the plaintiff to recover the cost of hiring new counsel to correct the defendants' failure to sue a necessary party in both of the underlying suits. *Id.* at *6. *Certain Underwriters* tracks the Illinois cases because it permits recovery of attorneys' fees paid to new counsel in an attempt to "cure the damage," *Duignan*, 667 N.E.2d at 613. Like the plaintiffs in *Nettleton v. Stogsdill* and *Sorenson v. Fio Rito*—and unlike Webb and Beversdorf here—the plaintiffs in *Certain Underwriters* did not seek recovery of inflated expenses incurred in the course of the initial, flawed litigation; they sought recovery of fees paid to replacement counsel hired to fix the defendants' mistakes.

the costs of arbitration they had already begun. The straight-forward causal connection that justified application of the third-party litigation exception in other cases is not present in this suit. Even, then, if FINRA breached its contract with Webb and Beversdorf, that breach would not alleviate Webb and Beversdorf's obligation to shoulder the legal costs associated with their decision to pursue a wrongful termination claim against Jefferies. *See Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001) ("In the United States, parties are ordinarily required to bear their own attorney's fees…."). Illinois courts have consistently described and applied the exception in a way that precludes its application here.[3]

When a defendant removes to federal court, as FINRA did here, its plausible and good faith estimate of the amount in controversy establishes jurisdiction unless it is a "legal certainty" that the plaintiffs' claim is for less than the requisite amount. *St. Paul Mercury Indem. Co.*, 303 U.S. at 288–89;

---

[3] We do not reach this conclusion simply because the cases have all involved a defendant whose wrong forced the plaintiff to bring or defend a third-party lawsuit. *See* Dissenting Op. at 16–17 (observing that the "frequent occurrence of a fact pattern does not impose an analytical limitation on a principle unless some animating component of that principle limits application to the particular fact pattern."). While we do not think the uniform occurrence of this fact pattern irrelevant, our conclusion is driven by the way that the Illinois courts (and, for that matter, the RESTATEMENT (SECOND) OF TORTS, *see supra* at 6) state the rule governing the recovery of third-party litigation expenses: they invariably include this limitation. The limit is not irrational; indeed, we can imagine reasons why Illinois might want to draw a line between attorneys' fees clearly attributable to the defendant's breach and those that are harder to sort out.

*Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 579 (7th Cir. 2017). Here, Illinois law makes it a "legal certainty" that Webb and Beversdorf's claim is for less than the requisite amount.[4] Diversity jurisdiction does not exist.

### III.

Webb and Beversdorf leave it at diversity, but FINRA makes an additional argument for federal question jurisdic-

---

[4] The dissent argues that the "legal certainty" standard, *St. Paul Mercury Indem. Co.*, 303 U.S. at 289, requires a federal court, where possible, to construe state law to allow the recovery of damages. Dissenting Op. at 19–20. That is not how the "legal certainty" standard works. The court first decides whether, assuming the facts the plaintiff alleges are true, state law allows recovery of the damages the plaintiff seeks. If state law forecloses recovery of the damages, it is certain that the claim is for less than the jurisdictional amount. Otherwise, the court accepts the plaintiff's good faith valuation of the claim. *See Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d 311, 315 (7th Cir. 1996) (applying this two-step inquiry); s*ee also St. Paul Mercury Indem. Co.*, 303 U.S. at 288 ("The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls."). The point of the "legal certainty" test is not to guide the court's interpretation of state law, but to save the court from having to make difficult predictions about whether and how much the plaintiff is likely to win. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006) ("[U]ncertainty about whether the plaintiff can prove its substantive claim, and whether damages (if the plaintiff prevails on the merits) will exceed the threshold, does not justify dismissal."). To that end, the test distinguishes between the law (which can render a claim's value certain) and the facts (which, if plausible, cannot). So far as we can tell, the suggestion that the "legal certainty" standard requires a federal court to accept the plaintiff's good-faith characterization of the law, as opposed to the plaintiff's good-faith valuation of his claim, is novel.

tion.[5] According to FINRA, this dispute is one of the rare state-law causes of action that gives rise to federal question jurisdiction under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005); *see also Merrill Lynch, Pierce, Fenner & Smith v. Manning*, 136 S. Ct. 1562, 1566 (2016) (holding that the *Grable & Sons* test determines the reach of "arising under" jurisdiction for purposes of the jurisdictional grant in the Securities Exchange Act of 1934).[6] Its theory is that the presence of an issue of federal securities law transforms this state-law contract claim into one arising under federal law.

Under *Grable & Sons*, a state-law claim may satisfy the "arising under" jurisdictional test if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in a federal court without disrupting the federal-state balance. *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons*, 545 U.S. at 314); *see also Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 466 (7th Cir. 2015). Federal jurisdiction is rarely established on this basis. *Hartland Lakeside Joint No. 3 School Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1033 (7th Cir. 2014). For a state-law claim to arise under a federal securities

---

[5] FINRA invoked both diversity and federal question jurisdiction in its notice of removal. Because the district court concluded that diversity jurisdiction existed, it did not reach the question of federal question jurisdiction.

[6] FINRA invokes both the general federal question statute, 28 U.S.C. § 1331, and the exclusive jurisdictional provision in the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. Because the Supreme Court held in *Manning*, 136 S. Ct. at 1566, that the *Grable & Sons* test applies in both contexts, we do not consider the two statutes separately.

claim, an issue of federal law must be the "cornerstone" of the plaintiff's complaint. *Manning*, 136 S. Ct. at 1569.

This dispute does not make it past the first factor of the *Grable & Sons* test. FINRA contends that because the plaintiffs' suit implicates FINRA's SEC-approved Code of Arbitration Procedure, this case requires us to decide whether FINRA breached a duty it owed Webb and Beversdorf under the securities laws. But FINRA fails to identify a single provision of federal law that we would have to interpret to resolve this case. The question is whether FINRA breached its arbitration agreement, and no "inescapable" provision of federal law drives that analysis. *Hartland*, 756 F.3d at 1035. To be sure, FINRA is regulated by the SEC, and its duties under the federal securities laws might come up. But that does not make federal law the "cornerstone" of the plaintiff's complaint. *Manning*, 136 S. Ct. at 1569. The Supreme Court has emphasized that a "federal role" is not enough. *Id.*

As for the rest of the *Grable & Sons* test, an issue not raised cannot be actually disputed or substantial, and without any federal question necessarily in play, we need not consider how taking the question would affect the federal-state balance. This is a state-law contract claim, and FINRA's effort to pull it within federal question jurisdiction fails.

## IV.

We VACATE the judgment for lack of jurisdiction and REMAND the case to the district court with instructions to remand to state court.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I agree with the majority that federal question jurisdiction is lacking. However, I reach a different conclusion with respect to diversity jurisdiction. Specifically, I cannot agree that we know, to a "legal certainty," that Messrs. Webb and Beversdorf cannot recover the damages that they allege, including the attorneys' fees expended in the earlier arbitration.

A defendant seeking removal of a state action to federal court must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a).

> "By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure." As the Supreme Court explained in *Dart Cherokee Basin Operating Co.*, "Congress, by borrowing the familiar 'short and plain statement' standard from Rule 8(a), intended to 'simplify the "pleading" requirements for removal' and to clarify that courts should 'apply the same liberal rules [to removal allegations] that are applied to other matters of pleading.'"

*Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017) (alteration in original) (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014)). Therefore, "[j]ust as we generally accept the plaintiff's good-faith allegations of the amount in controversy to establish diversity jurisdiction, 'when a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or

questioned by the court.'" *Id*. at 579 (footnote omitted) (quoting *Dart Cherokee Basin Operating Co.*, 135 S. Ct. at 553). "Once this has been done, and supported by proof of any contested jurisdictional facts, the presumption is the one stated in *St. Paul Mercury* [*Indemnity Co v. Red Cab Co.*, 303 U.S. 283, 291 (1938)]: the estimate of the dispute's stakes advanced by the proponent of federal jurisdiction controls unless a recovery that large is legally impossible." *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011).

We also have observed that the legal certainty test sets a high bar for excluding federal subject matter jurisdiction "for good reason: District courts should not get bogged down at the time of removal in evaluating claims on the merits to determine if jurisdiction exists." *Carroll v. Stryker Corp.*, 658 F.3d 675, 681 (7th Cir. 2011). Thus, typical examples of claims considered "'legally impossible' for jurisdictional purposes" involve "statutory or contractual cap[s] on damages." *Id*.

With this principle in mind, we must turn to Illinois state law. Here, it is important not to get off on the wrong foot by how we characterize this action. It is not an attorneys' fees action; it is a damages action based on the breach of a contract. This distinction is very important. Illinois normally would not allow the recoupment of attorneys' fees for success in maintaining the present action. It does recognize, however, that attorneys' fees incurred in an earlier action can be a measure of damages for an individual's misfeasance in that earlier action. *See Duignan v. Lincoln Towers Ins. Agency*, 667 N.E.2d 608, 613 (Ill. App. Ct. 1996).

The Illinois appellate court explained the principles underlying this rule, and demonstrated their application, in *Sorenson v. Fio Rito*, 413 N.E.2d 47 (Ill. App. Ct. 1980). In

*Sorenson*, a widow had retained an attorney, Fio Rito, to handle her husband's estate. Rather than attending to it, however, the attorney let it languish in his office; taxes went unpaid, and tax authorities imposed penalties. Sorenson then retained a new attorney to handle the estate, and through that attorney's unsuccessful attempts to obtain refunds of penalties and interest, she incurred attorneys' fees. *See id*. at 50. Sorenson then brought an action against the first attorney, Fio Rito, for damages. Among the damages that she claimed were fees paid to her second attorney for challenging the penalties. The trial court ruled that Sorenson could recover these damages from Fio Rito.

Fio Rito maintained in the state appellate court that the American Rule, which generally precludes a plaintiff from recovering attorneys' fees expended to bring a lawsuit against a wrongdoer, foreclosed such damages. *See id*. at 51. The appellate court disagreed. It explained that Fio Rito was "confus[ing] the exception with the general rule. The general rule in Illinois is that one who commits an illegal or wrongful act is liable for all of the ordinary and natural consequences of his act." *Id*. The American Rule governing attorneys' fees limited this general rule, but *only* in situations "where a successful litigant seeks to recover his costs in maintaining the lawsuit"; it was not "intended to preclude a plaintiff from recovering losses directly caused by the defendant's conduct simply because those losses happen to take the form of attorneys' fees." *Id*. at 51–52. Applying these principles to Sorenson's claim, the court stated:

> The plaintiff here is not attempting to recover
> the attorneys' fees she expended in bringing this

lawsuit. Rather, she seeks to recover losses in-
curred in trying to obtain refunds of tax penal-
ties which were assessed against her solely as a
result of the defendant's negligence. Had the
plaintiff been forced to hire an accountant to re-
pair the damage caused by the defendant's con-
duct, she would undoubtedly have been enti-
tled to recover the accountant's fee as an ordi-
nary element of damages. There is no basis in
logic for denying recovery of the same type of
loss merely because the plaintiff required an at-
torney instead of an accountant to correct the
situation caused by the defendant's neglect. In
holding the defendant liable for the plaintiff's
losses, we are not violating the policy against
"penalizing" a litigant for defending a lawsuit.
We are simply following the general rule of re-
quiring a wrongdoer to bear the consequences
of his misconduct.

*Id*. at 52. The facts of our case are different. Here, the plaintiffs
are demanding that the arbitrator in the underlying matter re-
imburse them for the attorney fees that they incurred because
of the arbitrator's alleged lapse. The principle nevertheless re-
mains the same.

As the majority notes, most cases addressing the recovery
of attorneys' fees involve situations in which "the defendant's
wrong forced the plaintiff into litigation with a third party"—
"when the defendant caused the third-party suit" as opposed
to simply "caus[ing] the legal fees to increase in an already
existing third-party suit." *See* Majority Opinion 6–7 (collecting
cases). However, the frequent occurrence of a fact pattern

does not impose an analytical limitation on a principle unless some animating component of that principle limits application to the particular fact pattern. Here, the majority points to no such consideration. Nor does Illinois case law suggest any such limitation. Indeed, a colleague on the district court has written that it demonstrates the opposite. In *Certain Underwriters at Lloyd's, London v. Johnson & Bell, Ltd.*, No. 10 C 7151, 2011 WL 3757179 (N.D. Ill Aug. 25, 2011), the underwriters had hired Johnson & Bell to analyze their coverage responsibilities in two lawsuits and "to prepare and file complaints for declaratory judgment as necessary in connection with both suits." *Id*. at *1. The underwriters later brought an action in federal court asserting state law malpractice claims against Johnson & Bell related to its representation in the two earlier actions. Specifically, the underwriters alleged that it incurred unnecessary attorneys' fees based on Johnson & Bell's handling of two underlying actions, the *Lewis* action and the *Zarndt* action.

One of Johnson & Bell's alleged missteps was providing negligent advice to the underwriters that they had a duty to provide representation in the *Lewis* lawsuit. With respect to those fees, the underwriters contended that "it would not have undertaken its representation of the defendants in the underlying *Lewis* lawsuit but for defendants' advice." *Id*. at *5. The underwriters did not make an equivalent claim with respect to the *Zarndt* action.

A separate failure, however, was that Johnson & Bell negligently had failed to name a necessary party in both the *Zarndt* and *Lewis* actions. Consequently, they had to hire replacement counsel in those lawsuits and to incur unnecessary attorneys' fees to correct the errors. Relying on *Sorenson* and

other Illinois cases, the district court held that Illinois law did not bar the underwriters' claims: "Defendants' omission of FCC as a defendant in the … declaratory judgment actions allegedly necessitated correction of the pleadings at a fixed cost to plaintiff. At the time the fees were incurred, it was clear that the fees were directly attributable to counsel's neglect." *Id.* at *7 (citing *Sorenson*, 413 N.E.2d at 52). The court saw no analytical significance to the fact that the underwriters had incurred the fees in existing litigation, rather than incurred in a separate lawsuit. Moreover, the court made no distinction between fees incurred in the *Lewis* action, which would not have been undertaken absent Johnson & Bell's negligence, and those incurred in the *Zarndt* action, the defense of which the underwriters did not challenge.

Here, Messrs. Webb and Beversdorf do not seek damages from FINRA in the form of attorneys' fees expended in this action. Instead, they seek damages from FINRA that include the expenditure of attorneys' fees in the underlying arbitration. They claim that these damages are "the direct result" of FINRA's failure to create fair procedures and of FINRA's interference in the arbitral process.[1] Illinois law does not preclude a plaintiff from "recovering losses directly caused by the defendant's conduct simply because those losses happen to take the form of attorneys' fees." *Sorenson*, 413 N.E.2d at 52. Moreover, the court inquired, and plaintiffs' counsel represented on the record, that the fees paid to FINRA and to arbitral counsel exceeded $75,000.[2] *See Rising-Moore v. Red Roof*

---

[1] R.1-1 at 7.

[2] *See* R.35-2 at 3–4.

*Inns, Inc.*, 435 F.3d 813, 816 (7th Cir. 2006) (finding that plaintiff's counsel's settlement demand could support a finding that the amount in controversy had been satisfied); *cf. Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000) (observing that a plaintiff's refusal to stipulate that his claim is less than $75,000 raises an inference that he believes his claim is worth more). Consequently, the district court properly determined that the amount in controversy was not in question.

As noted at the outset of this separate opinion, we have said, straightforwardly and firmly, that "[t]he legal-certainty test sets the bar high for excluding federal subject-matter jurisdiction, and for good reason: District courts should not get bogged down at the time of removal in evaluating claims on the merits to determine if jurisdiction exists." *Carroll*, 658 F.3d at 681. This rule, rooted in the long-standing jurisprudence of the Supreme Court, *see St. Paul Mercury Indem. Co.*, 303 U.S. at 289, is followed faithfully throughout the Country, *see, e.g., Colavito v. New York Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006). When the applicable state law definitively precludes recovery of the jurisdictional amount, we have not hesitated to say that the federal court is without jurisdiction. *See, e.g., Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d 311, 317–18 (7th Cir. 1996). However, when state law is "unsettled," we will not engage in guesswork to resolve the issue of state law prematurely. *Geschke v. Air Force Ass'n*, 425 F.3d 337, 341 (7th Cir. 2005).[3]

---

[3] We note in passing, however, that when a claim for punitive damages comprises the vast bulk of the amount necessary to reach the jurisdictional threshold, we have proceeded with a heightened degree of caution. *See*

Here, the majority opinion, quite admittedly, *see* Majority Opinion 9, engages in such guesswork. Frankly admitting that it cannot say with any certainty how Illinois courts would resolve the plaintiffs' substantive claims, it ignores the court's teaching in *Geschke*. Taking a guess on the content of state law, it denies the defendants their rightful federal forum. In doing so, it effectively chides the district court for having followed the established law of the circuit and tells future district courts to ignore *Geschke* and to follow its example today of becoming bogged down in reading "tea leaves" on the content of state law. It departs from the established practice of accepting jurisdiction and of confronting the content of state law by later employing other federal practice devices that are far better suited to addressing, sometimes with the help of the state court, the intractable problems inherent in the "*Erie* guess."[4] *See, e.g.*, *Colavito*, 438 F.3d at 231-35 (deciding the jurisdictional amount issue and then determining through motions for summary judgment, for dismissal for failure to state a claim, and by certification whether the plaintiff could state a viable cause of action).

Because I believe that the district court followed established practice, grounded in well-settled case law across the Nation, I respectfully dissent from the dismissal for want of subject matter jurisdiction.

---

*Del Vecchio v. Conseco, Inc.*, 230 F.3d 974, 978–79 (7th Cir. 2000); *see also Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993).

[4] *See generally* Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism*, 78 Va. L. Rev. 1671 (1992).